**UNITED STATES DISTRICT COURT**
**SOUTHERN DISRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  1:23-cv-7924 |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| GUOSHENG QI and GRIDSUM HOLDING INC., | |
| Defendants, and | |
| HUIJIE HE, | |
| Relief Defendant. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), alleges as follows for the period from September 2016 to June 2020 (the "Relevant Period"), concerning Gridsum Holding Inc. ("Gridsum"), a publicly traded company whose shares traded on the Nasdaq Global Select Market ("Nasdaq"), and Guosheng Qi ("Qi") Gridsum's CEO (collectively, "Defendants"):

## SUMMARY

1.      This case involves Defendants' misuse and unreported use of funds raised in a 2016 initial public offering (IPO) as well as Defendants' failure to disclose millions of dollars in related-party transactions that benefitted Defendant Qi's family members.

2.       Within days of Gridsum's IPO and continuing for three years, Gridsum, and Qi directed a series of undisclosed payments to Qi's wife and mother-in-law for supposed consulting

contracts between Gridsum and a company controlled by Qi's mother-in-law.  The total value of these related party transactions equaled $7.1 million, and Qi and his family directly or indirectly received at least $5.2 million.

3.      Gridsum and Qi also falsely stated in Gridsum's 2016, 2017, and 2018 annual reports that no IPO proceeds were used to pay officers, directors, or their associates.  In fact, Gridsum's officers, directors, and associates received approximately $3.8 million of IPO proceeds that were paid from U.S. bank accounts that Qi controlled.  Qi's wife received approximately $2.5 million of these IPO proceeds.

4.      As a result of the conduct alleged herein, Defendants Qi and Gridsum have committed securities fraud and other securities violations.  Defendant Qi also aided and abetted some of Gridsum's violations.  The violations alleged in this Complaint were part of a scheme among the defendants to use IPO proceeds and other Gridsum funds to enrich Qi.

5.      Qi and Gridsum violated, and unless restrained and enjoined may continue to violate, Sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)-(3)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.      Gridsum violated, and unless restrained and enjoined may continue to violate, Sections 13(a) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(a) and 78m(b)(2)(B)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§240.12b-20 and 240.13a-1].

7.      Qi also violated Exchange Act Rules 13a-14 and 13b2-2 [17 C.F.R. §§240.13a-14 and 240.13b2-2], and aided and abetted Gridsum's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§240.12b-20 and 240.13a-1].

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. § 78u and 78aa], and 28 U.S.C. § 1331.

9.      In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce or the mails in connection with the acts, practices, and courses of business alleged herein.

10.      Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because, among other things, some of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.  For example, during the Relevant Period, the Company's stock was publicly traded on Nasdaq, located in the Southern District of New York.  In addition, several individuals residing in the Southern District of New York purchased and sold Gridsum stock during the Relevant Period.  The false and misleading statements identified in this Complaint were directed to investors located in the Southern District of New York.

**DEFENDANTS**

11.      **Qi**, age 39, served at all relevant times as Gridsum's Chief Executive Officer (CEO), Chairman of its Board, and as one of Gridsum's founders.  Qi founded Beijing Gridsum in 2005 when he was a student at Tsinghua University.  Qi holds a bachelor's degree in computer science from Tsinghua University.  Qi is a resident of Beijing, China and Hong Kong.

12.      **Gridsum,** is a cloud-based analytics company that commenced operations in December 2005 in China with the establishment of Beijing Gridsum Technology Co., Ltd.  Gridsum

later established five additional operating companies in China and incorporated Gridsum Holding

Inc., under the laws of the Cayman Islands on July 21, 2014, as the parent holding company and the

vehicle for listing in the U.S.  Gridsum conducts operations in China principally through a complex

variable interest entity ("VIE") structure with Gridsum Holding (Beijing) Co., Ltd. ("Gridsum

Beijing") as its parent and its subsidiaries.  Gridsum's founder, CEO, and Chairman (Guosheng Qi)

is the majority owner of Gridsum Beijing.  Gridsum consolidated the financial statements of

Gridsum Beijing and its subsidiaries as a VIE under U.S. Generally Accepted Accounting Principles

(" US GAAP").  From September 23, 2016, when it completed its IPO, until April 5, 2021, when it

went private, Gridsum was a foreign private issuer and an emerging growth company who had a

class of securities registered with the Commission under Section 12(b) of the Exchange Act.

During that period, Gridsum filed annual reports with the Commission on Form 20-F, electing to

prepare its financial statements in accordance with US GAAP.  Gridsum's American Depository

Shares ("ADS") were listed on Nasdaq under the trading symbol "GSUM."  On April 5, 2021,

Gridsum went private pursuant to Rule 13e-3 under the Exchange Act through a merger agreement

and filed a Schedule 13E-3.  Gridsum, the surviving entity of the merger, bought back its ADSs for

$2 per share, and withdrew its registration with the Commission.

### RELIEF DEFENDANT

13.    **Huijie He** ("Ms. He"), age 41, is a resident of Beijing, China and Hong Kong. Ms.

He is the wife of Gridsum's CEO, Qi, and purportedly serves as Gridsum's Vice President of

Business Development.  Ms. He also uses the name "Scarlett."

## OTHER RELATED ENTITIES AND PERSONS

14.    **Yaping Yu** ("Yu"), age 65, resides in Lanzhou City, Gansu Province, China.  Yu is

the mother of Ms. He and the mother-in-law of Qi.  Yu is the sole director and control person of

Cloud Asia Business Consulting, a Hong Kong company.  Yu did not have right of permanent residence in Hong Kong.  According to bank records, Yu is unemployed and retired.

15.   **Cloud Asia Business Consulting Limited ("Cloud Asia")** is a Hong Kong company organized on December 31, 2015 by Yu and officially established on January 8, 2016. In Cloud Asia's 2022 annual report to the Hong Kong government, it reported that Yu was its sole director and shareholder and described her as a "Merchant" with an address in China.  There is no known operations or physical address of Cloud Asia in Hong Kong.

## FACTS

### I.  Gridsum's Public Filings Contained Material Misstatements and Omissions Concerning the Use of IPO Proceeds

#### A.  Gridsum's IPO Prospectus

16.   Gridsum completed its IPO of ADSs on September 23, 2016.  Qi signed the amended Registration Statement on Form F-1, and Gridsum filed it with the Commission on September 21, 2016.  The amended Form F-1 included a preliminary prospectus.  On September 22, 2016, Gridsum's IPO was declared effective, and on September 23, 2016, Gridsum issued a final prospectus.

17.   Shortly after, Gridsum's underwriter wired approximately $92 million of IPO proceeds to Gridsum's US bank accounts in two installments.

18.   Gridsum's prospectus, filed on Form F-1, stated, "We intend to use the net proceeds of this offering for working capital and other general corporate purposes, including investments in technology and infrastructure, product development and expansion of sales and marketing efforts."

19.   The prospectus did not disclose that the Defendants would transfer IPO proceeds to the personal bank accounts of company insiders, including officers and directors, or their immediate family members.

20.    On September 28, 2016, Gridsum received the first installment of IPO proceeds of approximately $80 million.

21.    Just one day later, on September 29, 2016, Gridsum wired $300,000 of IPO proceeds to the CEO's wife, Ms. He, ostensibly as money owed to her mother's company, Cloud Asia, for purported consulting services.  It was the first of many transfers of IPO proceeds to officers, directors, and their family members.

22.    Gridsum's CEO, Qi, was one of two authorized signatories on these accounts.

23.    Gridsum failed to disclose these transfers of IPO proceeds to corporate insiders in its IPO prospectus, and as described below, made similar materially false statements about its "Use of IPO Proceeds" in its 2016, 2017, and 2018 annual reports filed on Forms 20-F.

**B.  Gridsum's 2016 Form 20-F**

24.    On April 27, 2017, Qi signed and Gridsum filed with the Commission Gridsum's original annual report on Form 20-F for its fiscal year ended December 31, 2016.

25.    In that 2016 Annual Report Gridsum and Qi claimed that from the IPO through April 27, 2017, Gridsum used IPO proceeds as follows:

> We have used US$13.8 million net proceeds from our initial public offering for general corporate purposes which include working capital management, improvement of corporate facilities, sales and marketing activities and other general and administrative matters.
>
> **None of the net proceeds from our initial public offering were directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our Class A or Class B ordinary shares, or our affiliates.** [emphasis added]

26.    In reality, from September 23, 2016 through April 27, 2017, Gridsum, through the U.S. bank accounts Qi controlled, paid more than $1.5 million of IPO proceeds to its officers, directors, and their family members, including approximately $1 million to Qi's wife, Ms. He.

**C. Gridsum's 2017 Form 20-F**

27.     On January 7, 2019, Qi signed and Gridsum filed with the Commission Gridsum's annual report on Form 20-F for its fiscal year ended December 31, 2017.  This 2017 annual report also included restated consolidated financial statements for Gridsum's 2015 and 2016 fiscal years.

28.     In that 2017 annual report Gridsum and Qi claimed that from the IPO through December 31, 2017, Gridsum used IPO proceeds as follows:

> We have used approximately US$65.6 million net proceeds from our initial public offering for general corporate purposes which include working capital, improvement of corporate facilities, sales and marketing activities, business acquisition and other general and administrative matters.  **None of the net proceeds from our initial public offering were directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our Class A or Class B ordinary shares, or our affiliates.**  [emphasis added]

29.     The 2017 annual report thus repeated the same false and misleading statement that none of the net proceeds of the IPO were paid directly or indirectly to directors, officers, or their associates.

30.     From September 23, 2016 through December 31, 2017, Gridsum, through the U.S. bank account Qi controlled, paid more than $3.1 million of IPO proceeds to its officers, directors, and their family members, including more than $2 million to the Qi's wife, Ms. He.

**D. Gridsum's 2018 Form 20-F**

31.     On April 24, 2019, Qi signed and Gridsum filed with the Commission Gridsum's annual report on Form 20-F for its fiscal year ended December 31, 2018.

32.     Gridsum's 2018 Annual Report, Gridsum and Qi claimed from the IPO through December 31, 2018, Gridsum used IPO proceeds as follows:

> We have used all of the net proceeds from our initial public offering for general corporate purposes which include working capital, improvement of corporate facilities, sales and marketing activities, business acquisition and other general and administrative matters. **None of the net proceeds from our initial public offering were**

> **directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our Class A or Class B ordinary shares, or our affiliates.** [emphasis added]

33.    The 2018 Annual Report thus repeated the false and misleading statement that none of the net proceeds of the IPO were paid directly or indirectly to directors, officers, or their associates.

34.    From September 23, 2016 through December 31, 2018, Gridsum, through the U.S. bank account Qi controlled, paid more than $3.8 million of IPO proceeds to its officers, directors, and their family members, including more than $2.5 million to Qi's wife, Ms. He.

**E.  Summary**

35.    In the approximately two-year period from the IPO effective date to the close of Gridsum's 2018 fiscal year, bank accounts that Qi controlled transferred IPO proceeds to his wife, Ms. He, on approximately 35 occasions, totaling more than $2.5 million.  Even after April 27, 2017, when Qi signed Gridsum's 2016 annual report—which stated that no IPO proceeds were used to pay officers, directors, or their associates—the U.S. bank accounts Qi controlled transferred IPO proceeds to other Gridsum officers and directors on approximately 30 additional occasions.

36.    Each of those Forms 20-F filed by Gridsum and signed by Qi were materially false and misleading.  Qi and Gridsum knew or were reckless in not knowing that these representations were false when they were made.  Moreover, these false and misleading statements were material. At least $3,885,642 of Gridsum's IPO proceeds were paid to officers, directors, or their family members, as follows:

## Table 1

| Payee | Cumulative Total as of April 27, 2017 | Cumulative Total as of December 31, 2017 | Cumulative Total as of December 31, 2018 |
| --- | --- | --- | --- |
| He, Huijie | ($987,612) | ($2,006,418) | ($2,541,481) |
| Other Officers and Directors | ($513,677) | ($1,138,860) | ($1,344,161) |
| Total | ($1,501,289) | ($3,145,278) | ($3,885,642) |
| | | | |
| IPO Proceeds Used to Date | $13.8mm | $65.6mm | $92mm |
| % of IPO Proceeds Paid to Officers, Directors, or Affiliates | 10.88% | 4.79% | 4.22% |

## II. Qi and Gridsum Failed to Disclose Related-Party Transactions in Its Annual Reports Filed with the SEC.

37.     In addition to the above materially false and misleading statements concerning the use of IPO proceeds, Qi and Gridsum entered into – but failed to disclose in annual reports as required – certain related party transactions.

38.     A related party transaction is a transaction between two parties who have a close association, such as family members and affiliates, have common ownership, or can significantly influence one another's management or operating policies, as distinguished from a transaction between third parties.

39.     Specifically, in each of the annual reports on Form 20-F that Gridsum filed during the Relevant Period, Qi and Gridsum failed to disclose related party transactions with Qi's wife, mother-in-law, and a shell company owned by Qi's mother-in-law.

40.     Qi and Gridsum failed to properly identify the following related party transactions with Cloud Asia, Yu, and Ms. He on its Forms 20-F for the periods ended December 31, 2016

through 2019, filed on April 27, 2017, January 7, 2019, April 24, 2019, and June 2, 2020, respectively:

**Table 2**

| Related Party Transactions | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|
| Cloud Asia contracts | ($800,000) | ($600,000) | ($500,000) | | ($1,900,000) |
| Payments to He, Huijie | ($1,307,000) | ($1,150,269) | ($1,061,700) | ($1,076,000) | ($4,594,969) |
| Business Development Loans | ($1,200,000) | ($1,150,269) | ($448,500) | ($155,000) | ($2,953,769) |
| Rent | ($107,000) | | ($313,200) | ($226,000) | ($646,200) |
| Wine | | | ($300,000) | ($695,000) | ($995,000) |
| Payments to Yu, Yaping | | | ($650,000) | | ($650,000) |
| Total | ($2,107,000) | ($1,750,269) | ($2,211,700) | ($1,076,000) | ($7,144,969) |

41.     Each transaction above is a related-party transaction, and the total amount of all related party transactions is $7,144,969.

42.     The total cash value of the transactions was $5,244,969 because although Gridsum entered into a contractual relationship with Cloud Asia worth $1.9 million, there is no evidence that Cloud Asia was ever actually paid $1.9 million.

43.     As a foreign private issuer, in accordance with Regulation S-K, Gridsum was required to file annual reports including audited financial statements on Form 20-F.

**A. Reporting Related Party Transactions**

44.     Gridsum elected to file its financial statements prepared in accordance with US GAAP.

45.     Item 404 of Regulation S-K, Item 7.B of Form 20-F, and US GAAP required Gridsum to disclose certain related party transactions.

46.     Item 404 of Regulation S-K states that a "foreign private issuer will be deemed to comply with this Item if it provides the information required by Item 7.B of Form 20-F . . . ."

47.     Item 7.B required Gridsum to disclose: (1) the nature and extent of any transactions . . . which are material to the company or the related party, or any transactions that are unusual in their nature or conditions . . . to which the company or any of its parent or subsidiaries was a party[;] (2) The amount of outstanding loans (including guarantees of any kind) made by the company, its parent or any of its subsidiaries to or for the benefit of any of the persons listed [below].

48.     Item 7.B defines related parties to include "(d) key management personnel . . . including directors and senior management . . . and close members of such individuals' families; and (e) enterprises . . . owned, directly or indirectly, by [close members of senior managements' families] . . . ."

49.     Item 7.B also states that "[c]lose members of an individual's family are those that may be expected to influence, or be influenced by, that person in their dealings with the company."

50.     Moreover, the instructions to Item 404(a) define related persons to include any immediate family member of a director or executive officer of a registrant, including "mother-in-law."

51.     Gridsum elected to prepare its financial statements in accordance with US GAAP. On the first page of each of its annual reports on Form 20-F for its fiscal years ending 2016, 2017, 2018, and 2019, Gridsum noted its decision to prepare the financial statements filed with the annual reports on the basis of US GAAP.  The Financial Accounting Standards Board Accounting Standards Codification ("ASC") is the single source of US GAAP for private issuers, like Gridsum. See https://asc.fasb.org/Home.  ASC Topic 850, Related Party Disclosures ("ASC 850") also requires disclosure of related party transactions in the financial statements.

52.     ASC 850 provides that related party transactions include, among other things, transactions between an entity and its principal owners, members of their immediate families, or affiliates, or "other parties . . . if one party . . . can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests."

53.     In addition, immediate family is defined as "Family members who might control or influence a principal owner or a member of management, or who might be controlled or influenced by a principal owner or a member of management, because of the family relationship."

54.     ASC 850 defines Affiliate as "party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity."

55.     ASC 850 also provides that the disclosures should include the (1) nature of the relationships, (2) descriptions of the transactions, (3) dollar amounts of the transactions; and (4) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

56.     Ms. He (Qi's wife) and Yu (Qi's mother-in-law) are related parties under Item 7.B and ASC 850, respectively, because they are "close member[s] of [the CEO's] famil[y]" and immediate family members of Qi.

57.     Cloud Asia is also a related party under Item 7.B because it is an "enterprise" owned by Yu, a "close member" of Qi's family.

58.     Cloud Asia is also a related party under ASC 850 as Yu's alter ego (and therefore an immediate family member) and Gridsum's affiliate.

59.     Moreover, Cloud Asia is a related party under ASC 850 because Gridsum and Qi "significantly influence[d] [Cloud Asia] to an extent that [Cloud Asia was] prevented from fully pursuing its own separate interests."  As described more below, despite entering into a contractual relationship with Gridsum worth $1.9 million, Cloud Asia was never actually paid.

**B.  Contractual Arrangements with Cloud Asia**

60.     As Table 2 reflects, from September 1, 2015 to at least September 30, 2018, Gridsum entered into four "consulting service contracts" with Cloud Asia, a company owned by Yu – Ms. He's mother and Qi's mother-in-law.

61.     All four contracts were signed by Gridsum's COO.

62.     The contracts totaled $1.9 million, and Cloud Asia purportedly was to provide search engine optimization and social media optimization services for an unspecified Gridsum website, as well as to provide training to certain Gridsum employees.

63.     The contracts contain several suspicious inconsistencies: The first contract was signed in September 2015, before Cloud Asia had even been organized as a company.  The terms of two of the contracts are overlapping.  The monthly compensation is inconsistent.   The website to be optimized by Cloud Asia is not specified.  Cloud Asia's address does not indicate the floor or suite number in the 26-story office building in Hong Kong.  Each of the four contracts calls for performing the same services to be provided year after year instead of indicating the completion of work and then the undertaking of new work.

64.     Gridsum's US bank accounts did not pay money directly to Cloud Asia.

65.     Instead, Gridsum paid Ms. He and Yu directly in connection with the Cloud Asia contracts.

66.     Cloud Asia failed to respond to requests for documents identifying the services it provided Gridsum.

67.     Yu stated in her individual bank account opening documentation as of July 2018 that she was unemployed and retired.  The fourth Cloud Asia consulting contract ran from October 2017 through September 2018, so Ms. Yu would have been retired and unemployed during at least 13 months of the contract term.

**C. Payments to Ms. He**

68.     In total, through the U.S. Bank accounts Qi controlled, Ms. He received approximately $3 million in "Employee Loans" and "Advances" for "Business Development" that went undisclosed.

69.     Based on documents available to Plaintiff, Ms. He did not repay her loan balance during the Relevant Period.

70.     Instead it appears that the only reduction in Ms. He's outstanding loan balance "for business development" came when Gridsum offset at least $706,769 of the balance by reducing the same amount due to Cloud Asia.  Invoices concerning two of the four Cloud Asia consulting contracts stated that Cloud Asia received its $500,000 service fee for each contract from Ms. He.

71.     It appears that Ms. He did not pay Cloud Asia for its purported services to Gridsum even though Ms. He received the money from Gridsum.

72.     Ms. He also received approximately $1 million in undisclosed payments for the purchase of fine wine, purportedly for business development, and approximately $650,000 in payments for rent for an unspecified location.

73.     These undisclosed payments were in addition to Ms. He's compensation for serving as Gridsum's Vice President for Business Development.

**D. Payments to Yu**

74.     From July through October 2018, Gridsum's US bank accounts controlled by Qi, made a series of payments totaling $650,000 to Yu's personal bank accounts in Hong Kong, one of which was opened days before the second payment was made.

14

75.     The bank memo lines for these payments read: "consulting service fee" or "service fee."  One of the payments had nothing in the bank memo line.

76.     Yu stated in her account opening documentation that she was unemployed and retired.

77.     .  Gridsum's July to October 2018 payments to Yu provided her with US dollars on hand in Hong Kong facilitating Yu's then-pending purchase of a condominium property there from Ms. He.  Having cash on hand in Hong Kong is advantageous given China's currency control regime.

78.     At times during the Relevant Period, Ms. He and her mother, Yu, both used the same Hong Kong address as a residence.

79.     On November 3, 2017, Ms. He executed an agreement to sell that residence to Yu for 6,300,000 HK$ (or approximately USD $800,000).  The completion date for the sale was postponed from March 2018 to October 18, 2018.

80.     Ms. He then completed the purchase of two new adjacent residences in Hong Kong, and Qi guaranteed one of the mortgage loans.

**E.  Qi Knowingly Failed to Comply with Gridsum's Policies**

81.     Gridsum's Code of Business Conduct and Ethics expressly prohibited, among other things, company loans to executive officers or their family members and other transactions that represented actual or apparent conflicts of interest.

82.     Qi, as CEO and Chairman of the Board, knew, or was reckless in not knowing, that Gridsum, through bank accounts Qi controlled, provided loans to his wife and engaged in undisclosed related party transactions with his wife, mother-in-law, and his mother-in-law's company.

83.     Despite this, Qi certified that he "received, read, underst[ood]. . . [and has] fully complied with . . . [Gridsum's] Code of Business Conduct and Ethics.

**F.   Qi Conceals Yu and Cloud Asia**

84.   In connection with the 2016 IPO, Qi signed management representation letters provided to Gridsum's auditors stating that all material related party transactions had been properly recorded and disclosed in the financial statements.

85.   In addition, on May 25, 2015 also as part of the pre-IPO diligence, Qi completed an IPO Officer and Director Questionnaire ("2015 Questionnaire").  On a Related Parties Table in the Questionnaire that called for a list of family members, explicitly including "mothers- and fathers-in-law," Qi listed his wife, Ms. He, and his own parents, but not his mother-in-law, Yu, or Cloud Asia.

86.   For 2015 through 2017, each annual Gridsum Related Parties List reports those same individuals as Qi's only family members (Ms. He and his parents).

87.   Each annual related party list reports that it was prepared based on the signed questionnaires of the relevant parties.

88.   On April 11, 2017, Qi signed a Gridsum Officer and Director Questionnaire ("2017 Questionnaire").  In response to the question:

> "I am not aware of a transaction or any currently proposed transaction, in which the Company was or is a participant and in which any RELATED PERSON, had or will have a direct or indirect material interest and the amount involved exceeds $120,000."

Qi responded: "False" explaining that his wife received a salary as a Gridsum employee and listed the amount. Qi, however, failed to disclose the other payments to his wife and mother-in-law or the transactions with Cloud Asia, that are the subject of this action.

89.   On March 3, 2020, the SEC requested information concerning Yu's relationship with Gridsum.  The company represented that it was unfamiliar with that name.  Gridsum never provided the information concerning Yu.

### III. Gridsum's Material Weaknesses

90.     Qi executed certifications filed with Gridsum's 2016, 2017, and 2018 annual reports. In these disclosures he acknowledged his responsibility for, "establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company."  Qi also certified that he and Gridsum's other certifying officer have: "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

91.     Gridsum disclosed the following two material weaknesses in each of its Form 20-F filings for the 2016, 2017, and 2018 fiscal years:

> a.  The lack of sufficient financial reporting and accounting personnel with appropriate knowledge of US GAAP and the SEC reporting requirements to properly address complex accounting issues and to prepare and review its financial statements and related disclosures in accordance with US GAAP and SEC financial reporting requirements; and
>
> b.  The lack of sufficient written policies and procedures for approval of contracts signed with newly engaged vendors for certain services.

92.     Beginning in its 2017 20-F, Gridsum stated that, "as required by Section 404 . . . our management including our chief executive officer and co-chief financial officers assessed the effectiveness of internal control over financial reporting as of December 31, 2017 . . . [and] concluded that our internal control over financial reporting was not effective."

**IV. Qi's False Certifications**

93.    Qi signed Gridsum's Forms 20-F during the Relevant Period.  In each filing, Qi

signed a certification, pursuant to Exchange Act Rule 13a–14, stating the following:

> 1. I have reviewed this annual report on Form 20-F of Gridsum
> Holding Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary
> to make the statements made, in light of the circumstances under
> which such statements were made, not misleading with respect to
> the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other
> financial information included in this report, fairly present in all
> material respects the financial condition, results of operations and
> cash flows of the company as of, and for, the periods presented in
> this report;

94.    Qi's certifications to these annual reports were false and misleading because he knew

or was reckless in not knowing that Gridsum's 2016, 2017 and 2018 annual reports did not disclose

related party transactions, including the transactions with his wife and mother-in-law and Cloud

Asia.

95.    Qi's certifications to these annual reports were also false and misleading because he

knew or was reckless in not knowing that Gridsum made payments to officers, directors, their

family members and affiliates, including Qi's wife, mother-in-law, and Cloud Asia.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a)(1)-(3) of the Securities Act**
(*Against Gridsum and Qi*)

96.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 95.

97.    Defendants, by engaging in the conduct above, singly or in concert with others, in

the offer or sale of securities, by the use of means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly:

a. Knowingly or recklessly employed a device, scheme, or artifice to defraud;

b. Knowingly, recklessly, or negligently obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. Knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

98.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1)-(3) of the Exchange Act [15 U.S.C. § 77q(a)(1)-(3)].

## SECOND CLAIM FOR RELIEF
### Fraud in Connection with the Purchase or Sale of Securities
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
### (*Against Gridsum and Qi*)

99.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

100.     By reason of the conduct described above, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly:  (1) employed devices, schemes, or artifices to defraud and/or (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

101.     Defendants acted with *scienter* in that they knowingly or recklessly engaged in the fraudulent conduct described above.

102.     By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 Thereunder
### (Against Defendant *Gridsum*)

103.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

104.     From September 26, 2016 through April 5, 2021, Gridsum, was an issuer of securities registered pursuant to Section 12 of the Exchange Act that filed required reports with the Commission under Section 13(a) of the Exchange Act and related rules and regulations that: (a) contained untrue statements of material fact; (b) failed to include, in addition to the information required to be stated in such report, such further material information as may be necessary in order to make the required statements, in light of the circumstances under which they were made, not misleading; or (c) failed to disclose any information required to be disclosed therein.

105.     By reason of the actions alleged herein, Defendant Gridsum violated and, unless restrained and enjoined, will continue violating Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

## FOURTH CLAIM FOR RELIEF
### Violations of Section 13(b)(2)(B) of the Exchange Act
### (Against Defendant *Gridsum*)

106.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

107.     By engaging in the conduct described above, Gridsum failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Gridsum's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with US GAAP; and

Gridsum's access to assets is permitted only in accordance with management's general or specific authorization, in violation of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

108.    By reason of the foregoing, Gridsum violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 13(a)-14 of the Exchange Act Rules
### (Against Defendant *Qi*)

109.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

110.    Defendant Qi, as the principal executive officer of an issuer with a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], certified to the best of his knowledge that one or more of the issuer's periodic reports filed with the Commission contained no untrue statements of material fact or omissions of material fact when Qi knew or recklessly disregarded that the report or reports contained untrue statements of material fact or omissions of material fact.

111.    By reason of the foregoing, Defendant Qi violated and, unless enjoined, will again violate Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Exchange Act § 13(a) [15 U.S.C. § 78m(a)].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 13b2-2 of the Exchange Act Rules
### (Against Defendant *Qi*)

112.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

113.    From May 2015 through June 2020, Defendant Qi, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with audits and reviews of Gridsum's financial statements or in the preparation or filing of Gridsum's documents or reports required to be filed with the SEC; or omitted to state, or caused another person

to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statement were made, not misleading, to an accountant in connection with audits and reviews of Gridsum's financial statements or in the preparation or filing of Gridsum's documents or reports required to be filed with the SEC.

114.     By reason of the foregoing, Defendant Qi violated and, unless enjoined, will again violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under Exchange Act § 13(b) [15 U.S.C. § 78m(b)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20 and 13a-1 Thereunder
### (Against Defendant *Qi*)

115.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95.

116.     By engaging in the conduct described above, Qi aided and abetted Gridsum's violations of Sections 13(a) [15 U.S.C. §§ 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1], in that he, acting with the requisite state of mind, provided substantial assistance to Gridsum in committing these violations.

117.     By reason of the foregoing, Qi aided and abetted Gridsum's violations of Sections 13(a) [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the SEC periodic reports that are accurate and not misleading.

118.     By engaging in the conduct described above, Qi knowingly or recklessly provided substantial assistance to Gridsum's filing of false and misleading annual reports with the SEC.

119.     By reason of the foregoing, Qi aided and abetted, and unless enjoined, will continue to aid and abet such violations.

### EIGHTH CLAIM FOR RELIEF
**Disgorgement of Unjust Enrichment**
**(*Against Relief Defendant He Huijie*)**

120.     The Commission realleges and reincorporates paragraphs 1 through 95 as if fully set forth herein.

121.     As described above, Defendants engaged in a scheme to defraud investors in connection with the offer, purchase, or sale of securities of Gridsum and to use the money raised to unjustly enrich themselves, and Relief Defendant Ms. He, and others.  Ms. He has no legitimate claim to the funds, property and benefits described above, and has thus been unjustly enriched under circumstances in which it is not just, equitable, or conscionable for it to retain such profits.

122.     By reason of the foregoing, it would be inequitable for Relief Defendant Ms. He to retain the proceeds resulting from Defendants' violations of the federal securities laws and such proceeds should be disgorged.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that the Defendants violated the provisions of the federal securities laws as alleged herein.

### II.

Permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)], Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. §§ 78m(a)] and Rules 10b-5, 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.10b-5240.12b-20, and 240.13a-1].

**III.**

Permanently restraining and enjoining Defendant Gridsum and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

**IV.**

Permanently restraining and enjoining Defendant Qi and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Rule 13a-14 [17 C.F.R. § 240.13a-14] and Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

**V.**

Ordering each Defendant and the Relief Defendant to disgorge all their ill-gotten gains, plus prejudgment interest thereon, pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)].

**VI.**

Ordering Defendants to pay civil monetary penalties in an amount determined by the Court pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VII.**

Permanently prohibiting Qi from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to

Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VIII.

Granting any other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a trial by jury on all issues so triable.

Dated:  September 7, 2023                           Respectfully submitted,

                                      /s/ Derek Bentsen

                                       Derek Bentsen
Kristen M. Warden*
Michael T. Grimes*
Adam Eisner*
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20594
Phone: (202) 551-6426 (Bentsen)
BentsenD@sec.gov
Phone: (202) 551-4661 (Warden)
Wardenk@sec.gov
Phone: (202) 551-4861 (Grimes)
Grimesmi@sec.gov
Phone: (202) 551-4871 (Eisner)
Eisnera@sec.gov

* *Pending admission pro hac vice*

**Of Counsel:**
Charles J. Felker
100 F Street NE
Washington, DC